## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| THSIA BRIGGINS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | 1:08-CV-01861-KOB |
| | ) | |
| ELWOOD TRI, INC. and | ) | |
| HONDA MANUFACTURING OF | ) | |
| ALABAMA, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

## I.        INTRODUCTION

This Fair Labor Standards Act ("FLSA") matter comes before the court on Defendants'

Motion to Decertify the Collective Action and Dismiss Opt-In Plaintiffs' Claims (doc. 99). The

parties have fully briefed the motion, with accompanying voluminous evidentiary submissions. The

defendants, Honda Manufacturing of America and Elwood TRI, Inc., seek to decertify the collective

action this court conditionally certified on June 8, 2009 (doc. 40), arguing that so many material

distinctions exist among the opt-in plaintiffs that they do not meet the "similarly situated" standard

and that, accordingly, the case would be unmanageable if tried collectively and would simply result

in a mini-trial for each plaintiff. The plaintiffs respond by asserting that HMA's pay practice, which

the plaintiffs call a "scheduled time" system, is common to all plaintiffs and is structured to make

the plaintiffs work off the clock.

The court has considered the parties' briefs and evidentiary submissions, and disagrees with

1

the plaintiffs' representation that HMA's scheduled time compensation system structurally resulted in off-the-clock work. The scheduled time system may have pressured plaintiffs to perform off-the-clock work, but off-the-clock work was not inherent in HMA's pay practices. The distinction between a compensation system that structurally results in unpaid overtime as opposed to one that pressures some plaintiffs to work off the clock is significant, because the extent to which plaintiffs worked off the clock—and whether such work even occurred—varies materially among the class. Although the defendants have all but admitted that off-the-clock work sometimes occurs, the court nevertheless has not found sufficient consistency among the certified class, and notes that so many variables govern whether a plaintiff works off the clock that to determine the defendants' *liability*, and not merely its damages, would require individual testimony.

The court concludes that such collective action trial would be unmanageable and, more fundamentally, that the plaintiffs in this case are not "similarly situated" to each other for the purpose of establishing liability under the FLSA. For the reasons stated below, the court finds that the defendants' motion to decertify is due to be granted.

## II.    BACKGROUND

A.   Procedural History

Plaintiff Thsia Briggins brings this action against Defendants HMA and Elwood, alleging violations of the FLSA. Plaintiff Briggins, a process associate at HMA's Lincoln, Alabama facility, claims that the defendants required her to work off the clock and did not pay her for work performed before her shift, during her unpaid lunch break, and after her shift. Although all associates perform work for HMA, the associates in this lawsuit are actually employed by defendant Elwood, a staffing agency that provides temporary employees to HMA. Associates employed directly by HMA have

a separate lawsuit pending before Judge Hopkins, *Burroughs v. Honda Manufacturing of Alabama*, No. 1:08-CV-1239-VEH, although the claims and issues involved are otherwise identical. Plaintiff Briggins sues on behalf of herself and other similarly situated Elwood employees under § 16(b) of the FLSA, 29 U.S.C. § 216(b).

Under the Eleventh Circuit's two-tier approach, this court conditionally certified the class under the fairly lenient standard explained in *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208 (11th Cir. 2001). *See doc.* 40 at 12. The court rejected the defendants' allegation that company policy did not require process associates to work pre-shift or during their unpaid meal breaks, relying on Plaintiff Briggins's and the putative class members' affidavits asserting that "they were not only required to perform work off the clock, they were also trained to perform such work off the clock before the beginning of each shift or during the meal break." Doc. 40 at 11. The court concluded that, under the lenient conditional certification standard, Plaintiff Briggins and the putative class members had made a "modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." Doc. 40 at 9 (quoting *Harper v. Lovett's Buffet*, 185 F.R.D 358, 363–65 (M.D. Ala. 1999)). Finally, the court found that a collective action would be beneficial and judicially efficient.

After the court conditionally certified the class, the plaintiffs mailed notice to approximately 2,600 current and former associates employed by Elwood. Of those who received notices, approximately 630 plaintiffs opted into the lawsuit. After the defendants filed numerous motions to dismiss the plaintiffs under various grounds, including, among others, failure to respond to discovery requests and the statute of limitations, more than 450 opt-in plaintiffs remain in this case. At the close of discovery, the defendants moved to decertify and to dismiss the claims of the opt-in

3

plaintiffs.[1]

A.   Description of Honda's Manufacturing Facility

The opt-in plaintiffs are all process associates at HMA's Lincoln, Alabama manufacturing facility, which employs approximately 4,500 associates. HMA's Lincoln facility consists of two separate production lines: Line 1 and Line 2, which have at various times produced the Odyssey, Ridgeline, Pilot, and Accord vehicles.  Each line is separately managed and organized, and each line contains six production departments. These departments are Weld, Paint, Assembly Frame ("AF"), Production Materials Control ("PMC"), and Vehicle Quality ("VQ"), and, before 2010, Engine Assembly ("AE"). After 2010, AE combined with a sub-department from AF to form the Powertrain department. Each department is identified by its name and line, resulting in twelve departments at the facility: AF1, AF2, Weld 1, Weld 2, Paint 1, Paint 2, AE1, AE2,  PMC 1, PMC 2, VQ1, and VQ2. Within these departments, most associates are assigned to either an "A team" or a "B team," and rotate shifts with that team on a biweekly basis. Most departments operate on two regular production shifts—the first shift from 6:30 A.M. to 3:00 P.M., and the second shift from 4:30 P.M. to 1:00 A.M.

Each department is further subdivided into zones, or areas. Each zone is line and shift specific. For example, the Weld department on Line 1 has seven zones per shift. As explained in the various declarations and depositions, the area where a specific process associate worked at any time could be identified by four variables—the line, the department, the zone, and the shift. For example,

---

[1]  Although the motion includes in its title the request to "dismiss opt-in plaintiffs' claims," the defendants did not address that request in their brief. The defendants, therefore, abandoned this request. *See Access Now, Inc. v. S.W. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed").

4

Linda Bailey, an Administration Division Manager at the facility, used "Weld Line 1, D Zone, A Team" as an illustration of how a specific zone may be identified. The number of zones or areas per department varies; for example, VQ only has only the Static and Dynamic areas on each line, while AF has, at times, had 20 zones per shift on Line 1 and 21 zones per shift on Line 2. In total, the departments at issue in this suit contain over 130 zones.

*Processes Performed by the Plaintiffs*

Within each zone, every associate is assigned one or more processes. Each process has its own Operation Standard, which are instructions on how to perform the process and a description of any tools and parts used in the process. In designing each process and calculating a process time ("TAKT time"), the Process Engineering ("PE") teams at HMA would consider the work tasks needed to manufacture a vehicle, and divide those work tasks into processes. In determining the number of processes and TAKT time per process, the PE teams would consider HMA's production targets, and would adjust the number of processes and TAKT time depending on whether HMA sought to ramp up or ramp down production. For each ramp up or ramp down, the PE team could potentially redesign processes and draft new Operation Standards. If a process was modified, the PE team would run production trials with the objective of ensuring that the process could be performed within the TAKT time. Notwithstanding the PE team's objective, some plaintiffs testified in deposition that the processes were impossible to finish within the TAKT time.

*Employee Hierarchy at the Facility*

Each zone, on each shift, has a separate Team Coordinator ("TC"). The TC is not part of the management team, but is an hourly lead associate that performs tasks like creating rotation schedules listing which associates would perform what processes and assisting associates with their duties. The

TCs would also run shift meetings at the start of each shift where they would cover topics such as issues encountered in the previous shift or policy information associates needed to know before starting their shift. Some TCs would also arrive at the zone before the shift to prepare the zone for the start of a shift. According to declarations submitted by the defendant, TCs have been paid overtime for this pre-shift work.

Most associates work within one of the production zones, although on occasion associates may work "off-line"—for example, to train associates how to perform a process or to train on processes related to new models not yet produced at the facility. The TCs report to a Team Manager ("TM"). Each TM is responsible for managing at least one or more zones or areas in a department. Some associates also worked in "Line Assist" positions, where their responsibility included assisting the TC and associates working on the line, and restocking parts at process stations before and throughout the shift.

B.   Time and Pay Practice for Process Associates at HMA

*Process associates are paid based on the hours of their shift and any additional overtime authorized by their managers*

HMA maintains numerous time scan terminals throughout its production floors. Although all associates scan at these terminals when they enter and exit the facility, the associates' scan-in and scan-out times are not used to determine their compensable hours. Instead, the associates are paid for the time between their scheduled shift start and shift stop. During a regular shift, an associate would receive two paid ten minute breaks and an unpaid thirty minute lunch break, resulting in eight hours of paid time on a regular shift. Associates would receive pay for all eight hours worked as long as they scan in before the start of their scheduled shift and scan out after the shift ends.

Associates could scan in any time before their shift and scan out any time after the shift ended. But if an associate scanned in after a shift began, he or she would be considered tardy and paid only for the hours between the scan-in and scan-out times. The same applies for associates who scan out before shift end. For example, if an associate had the first shift from 6:30 A.M. to 3:00 P.M., and scanned in at 6:17 A.M. and scanned out at 3:23 P.M., the associate would receive compensation for eight hours. If instead the associate scanned in at 6:35 and scanned out at 3:01 P.M., the associate would receive pay based only on eight hours less six minutes.[2]

Associates may also be compensated for work performed outside their shift times if given an overtime code by their TM. Each TM had an overtime budget for his or her zone, and HMA would often pay overtime to associates for work done either before or after a shift ended.  The defendants would pay associates one-and-a-half times their regular hourly rate for any time worked over eight hours in one day or for any hours worked  on Saturday, and two times the regular hourly rate for any hours worked on Sunday or on holidays. Although the defendants frequently pay overtime to associates, the plaintiffs allege that they receive overtime only when approved by a TM, and that they are required to work many more unauthorized and uncompensated hours to meet the demands of their positions and not fall behind on the line. This alleged gap between the hours actually worked by associates and the hours paid, labeled "gap time" by the plaintiffs, is at the core of this FLSA dispute.

*Preshift associates*

---

[2] For payroll purposes, HMA would round up scan-in and scan-out times in three minute increments. Thus, if a process associated scanned in at 6:34 or 6:35, the payroll system would round up their start time to 6:36. According to the declaration of Sara Turner, an Associate Administrator who processes payroll for HMA, this rounding up practice works to the benefit of the process associates because more overtime is scheduled for after the shift than before the shift.

Throughout the facility, TMs would commonly solicit associates to help prepare the line before the shift started. These preshift associates would usually volunteer and would arrive some predetermined number of minutes before a shift to prepare the work area in a zone by calibrating tools, stocking parts at the work station, and performing other tasks that ensure regular process associates can begin working once they arrive at their stations. The TMs would allocate preshift work out of their overtime budgets, and would authorize preshift associates to use the overtime code "PRE" when they scan in. Although the purpose of using preshift associates was to prepare the line so that the other associates could begin working at shift start, the plaintiffs stated in deposition that the effectiveness of the preshift associate varied. According to the plaintiffs, many preshift associates would often leave tasks unfinished, requiring the plaintiffs to work off the clock to be ready for the start of the shift.

*HMA's official policy regarding overtime and hours worked*

HMA's official policy prohibits unauthorized overtime. HMA communicates this policy to associates during the New Hire Orientation, where they are shown a PowerPoint presentation that states that they "should not perform any work before the start of shift, during lunchtime, or after the end of shift unless the work has been authorized by their Team Manager and they have been given an overtime code." *See* Decl. Linda Bailey, at ¶ 8 (Ex. 5 to doc. 100). Although Elwood associates do not receive these orientation materials, the same policy applies to them. The Honda Employee Handbook, which all associates are supposed to read before starting work at the facility, also states that the associates must "[p]erform all assigned work during the assigned times." *See* Decl. Linda Bailey, at ¶ 9 (Ex. 5 to doc. 100). HMA also submitted declarations from some of the TMs and TCs, who state that they were instructed to ensure that associates did not work before or after shift or

8

during lunch break without an overtime code. Although the plaintiffs do not dispute HMA's stated official policy, they argue that HMA's practice deviates significantly from its policy and that HMA only began to adhere more closely to this policy after this lawsuit was filed.

## III.   STANDARD GOVERNING DECERTIFICATION OF FLSA COLLECTIVE ACTIONS

A lawsuit under the FLSA may be brought "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." *See* 29 U.S.C. § 216(b). "To maintain an opt-in class action under § 216(b), plaintiffs must demonstrated that they are 'similarly situated.'" *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1217 (11th Cir. 2001).

The Eleventh Circuit outlined a two-tier approach to guide district courts in determining whether plaintiffs are similarly situated. Throughout both stages, the plaintiffs bear the burden of establishing that they are similarly situated. *See Grayson v. K Mart Corp.*, 79 F.3d 1086, 1097 (11th Cir. 1996). At the first stage, the "notice stage," the court decides whether to conditionally certify a class based only on the affidavits and allegations and uses a fairly lenient standard to determine whether to certify. *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208 (11th Cir. 2001).

After the close of discovery, the defendants initiate the second stage by filing a motion for decertification. At this second stage, "the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question." *Anderson v. Cagle's*, 488 F.3d 945, 953 (11th Cir. 2007) (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1214 (5th Cir. 1995)). Because the court can make a more informed factual determination, the second stage "is less lenient, and the plaintiff bears a heavier burden." *See Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1261 (11th Cir. 2008).

At both the first and second stages, the Eleventh Circuit has refused to draw bright lines in defining "similarly situated." *See Morgan*, 551 F.3d at 1261. Instead, the Court has explained that the more the evidence reveals material distinctions, the more likely a district court should decertify the collective action. *Anderson*, 488 F.3d at 953. "[A]lthough the FLSA does not require potential class members to hold identical positions, the similarities necessary to maintain a collective action under § 216(b) must extend 'beyond the mere facts of job duties and pay provisions.'" *Anderson*, 488 F.3d at 953 (internal citations omitted). Ultimately, this court's decision to decertify turns on a factual analysis, *see Morgan*, 551 F.3d at 1262, and is largely within this court's discretion, *see Anderson*, 488 F.3d at 953. If appealed, the decision is reviewed for abuse of discretion. *See Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1348 (S.D. Fla. 2007).

The Eleventh Circuit has identified three factors to consider at this second stage: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant[s] [that] appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations[.]" *Anderson*, 488 F.3d at 953 (alterations in original) (quoting *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)). As part of the third factor, the court will also consider whether it can "coherently manage the class in a manner that will not prejudice any party." *See Proctor v. Allsups Convenience Stores*, 250 F.R.D. 278, 281 (N.D. Tex.) (quoting *Johnson v. TGF Precision Haircutters*, 2005 U.S. Dist. LEXIS 44259, at *32 (S.D. Tex. Aug. 17, 2005)); *see also Hill v. Muscogee Cty. Sch. Dist.*, 2005 U.S. Dist. LEXIS 35725, at *8–9 (M.D. Ga. Dec. 20, 2005) ("At the core of the 'similarly situated' inquiry is the question whether the issues in the case can be adjudicated collectively."). If the plaintiffs cannot show that they are affected by a common plan or policy, the case could have "enormous manageability problems." *See*

*TGF Precision Haircutters*, 2005 U.S. Dist. LEXIS 44259, at *34.

## IV.    THE PARTIES' CONTENTIONS

*Defendants' Arguments*

The defendants argue that even if some plaintiffs may have prima facie cases of FLSA violations, the plaintiffs have not established evidence of a single decision, policy, or plan that caused them to work off the clock. Instead, the defendants contend that the evidenced produced in discovery illustrates significant variations among the plaintiffs—to the point that some could not even claim a violation of the FLSA—and that these variations are so material as to require decertification.

The defendants also assert that each of the three factors outlined in *Anderson v. Cagle's*, 488 F.3d 945 (11th Cir. 2007), support decertification. First, the defendants repeat their argument that variations in the plaintiffs' employment settings weigh against certification. Second, the defendants argue that they would have to present individualized defenses, including, among others, that a plaintiff's own testimony does not reflect a denial of overtime pay for hours worked; that a plaintiff could not have possibly worked the hours he said he did based on the punch-in times; and that a plaintiff's TM, TC, and/or other process associates in his zone will testify that he did not perform pre-shift, lunch break, or post-shift work. The defendants explain that they would not only have to raise individualized factual defenses to liability, but also individualized legal defenses, including, among others, whether a plaintiff's alleged pre-shift work was a *de minimis* violation of the FLSA.

Third, the defendants argue that fairness and procedural considerations weigh against certification, explaining that either (a) each plaintiff's claim would require an individual inquiry, or (b) representative testimony would be procedurally unfair because of significant factual

inconsistencies among the plaintiffs and the resulting likelihood that the defendants could be held liable to the entire collective class when it may not have undercompensated members of that class. Finally, the defendants argue that the recent Supreme Court decision of *Wal-Mart v. Dukes*, 131 S. Ct. 2541 (2011), which discussed the requirements for Rule 23 classes, weighs against granting certification.[3]

*Plaintiffs' Arguments*

The dominant theme in the plaintiffs' argument is that they are similarly situated because HMA uses a plant-wide "scheduled time" system that only pays the employees based on the start and stop times of their shift, and not based on their scan in and scan out times. At the core of the plaintiffs' case is the allegation that this scheduled time system requires the plaintiffs to work off the clock because they cannot possibly perform their job duties within the scheduled shift. They argue that the "scheduled time" system used by HMA is flawed because it "pays employees only on a group or 'gang' basis while the production line is running rather than treating employees as individuals." *See* Pl. Opp. Br. at 14 (doc. 130) (emphasis in original).

---

[3] The court did not consider the Supreme Court's opinion in *Dukes* in making its decision. As the parties' supplemental submissions demonstrated, cases deciding whether to apply *Dukes* to the FLSA collective action analysis have gone either way. *Compare Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, 2011 U.S. Dist. LEXIS 105302, at *26 (W.D.N.C. Sept. 16, 2011) (citing to *Dukes* with a *cf* signal to support its holding denying a motion to conditionally certify) *with Winfield v. Citibank, N.A.*, 2012 U.S. Dist. LEXIS 16449 (S.D.N.Y. Jan. 27, 2012) (explaining, on a motion to conditionally certify, that "numerous courts, including district courts in this Circuit, have refused to apply Dukes on motions for conditional certifications under the FLSA, concluding that the Rule 23 analysis had no place at this stage of the litigation."). Whether *Dukes* should apply to a motion to decertify is an unresolved question, although the weight of authority is against applying it to FLSA collective actions. The court, however, did not need to apply *Dukes* to decide whether the plaintiffs are similarly situated, and will leave the broader battles over the state of class action lawsuits to the attorneys. *See* Pl. Opp. to Def. Notice, at 5 (doc. 163) ("The defense bar has been so high on its success in defeating the *Wal-Mart Stores v. Dukes* Rule 23, Title VII class action last spring that its lawyers have essentially fanned out across the country, trying to persuade judges everywhere, in numerous types of cases, that the era of employment class actions was over. Defendants even now attempt to take this beyond the realm of *Dukes* and into collective action litigation despite the numerous cases holding differently.").

The plaintiffs also make several other arguments, including (a) that the defendants' individualized arguments relate to damages, and not to liability; (b) that the defendants' *legal* defenses of what constitutes "work" and *de minimus* time can be tried collectively and are not dominated by individual facts; (c) that plaintiffs need only be similar, and not identical, and that the differences cited by the defendant are immaterial; (d) that a plaintiff's credibility regarding his or her factual allegations and damages are matters for the jury, and not for this court to consider; (e) that the mere adoption of a policy to pay all associates for overtime does not preclude a common question of whether the defendants had an unofficial policy to not pay for off-the-clock work; (f) that the defendants' system is structured to require the plaintiffs to perform off-the-clock work to be able to keep up with the demands of the production line; (g) fairness and due process would be better achieved through a collective trial rather than several hundred individual trials, especially given the small amount of claims relative to the cost of litigation; (h) the case can be fairly tried on a collective basis because the defendant can still present individualized evidence; (i) that the use of sub-classes and bifurcation of the liability and damages stages would be a better way of managing the case than decertifying and creating hundreds of individual cases; (j) the plaintiffs will not depend on representative testimony to establish liability or backpay, but will instead rely on the testimony of HMA officials, timekeeping and payroll records, expert testimony, and the existence of the "scheduled time" compensation system; and (k) that the authority relied upon by the defendants is distinguishable.

13

## V.    DISCUSSION[4]

In responding to the motion to decertify, the plaintiffs have made the "common 'scheduled time'" compensation system the centerpiece of their argument. *See* Pl. Opp. Br. at 17 (doc. 130). This argument accords with courts deciding motions to decertify, which have considered a common policy or plan the core of the "similarly situated" analysis. *See Pacheco v. Boar's Head Provisions Co.*, 671 F. Supp 2d 957, 960–61 (W. D. Mich. 2009) ("There is no question that plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs.") (internal quotations omitted). Identifying a common policy or plan from which the plaintiffs' claims arise is significant, because it *may* overcome wide factual variation among the plaintiff class.  *See Wilks v. The Pep Boys*, 2006 U.S. Dist. LEXIS 69537, at *11–12 (M.D. Tenn. 2006) ("A material factor to many courts' analysis of factual and employment settings is whether they were all impacted by a single decision, policy, or plan.") (internal quotations omitted).  Because of the considerable overlap among the three factors considered on a motion to decertify, a common policy or plan *may*

---

[4] The court emphasizes the difficulty in engaging in factual analysis based on the one-sided presentation of facts. The defendants engage in extensive factual exposition and frequently cite to declarations and depositions.  The plaintiffs, however, in "disputing" the defendants' factual statements, often failed to cite to the evidentiary record to point out a factual dispute and would merely cross-reference one of the prior factual disputes. *See* Pl. Opp. Br. at 4 ("*See* Plaintiff's Responses to Par. 34, 36, and 38 above.").

Although the motion under consideration is not a motion for summary judgment, the Scheduling Order explained that Appendix II applies to motions to decertify the class. *See* Sched. Order at 4 (doc. 79). Appendix II requires the parties to provide "a specific reference to those portions of the evidentiary record upon which the dispute is based." *See* Appendix II at 4, http://www.alnd.uscourts.gov/Local/Court Forms/Sample Appendix II Summary Judgment.pdf. This requirement accords with Fed. R. Civ. P. 56(c) on summary judgment, which explains that parties disputing a fact must cite to particular parts of materials in the record and that courts need consider only the cited materials, although they *may* consider other materials in the record.

The parties in this case submitted volumes of evidentiary submissions, including fifty depositions, most of which ran upwards of one hundred pages. The defendants submissions alone totaled well over three thousand pages, although considerable overlap exists between the plaintiffs' and defendants' evidentiary submissions. Thus, the court has reviewed material where cited, but reviewed uncited materials in its discretion.

be determinative of whether the case should remain certified. *Cf. Johnson v. Big Lots Stores*, 561 F. Supp. 2d 567, 574 (E.D. La. 2008) ("These three factors are not mutually exclusive, and there is considerable overlap among them.").  Accordingly, the court begins its analysis with whether HMA had a common policy or plan that gave rise to the associates' FLSA claims.

At first glance, whether a single policy, plan or decision exists is a close question, depending on how HMA's compensation system is characterized. On one hand, the plaintiffs argue that HMA employs a "'scheduled time' system [that] systematically allows off-the-clock work outside such schedule to be compensated." Pl. Opp. Br. at 12 (doc. 130). Because the plaintiffs recognize that HMA will frequently pay overtime, it further defines HMA's policy as "not paying employees for *unscheduled* overtime work performed." Pl. Opp. Br. at 33 (doc. 130) (emphasis in original). Based on the evidence submitted, the plaintiffs' overall characterization of HMA's compensation system has some truth.

The court's review of the depositions indicates that many of the plaintiffs have, at some point during their employment with HMA, worked off the clock to prepare for the start of a shift or for the resuming of the shift after lunch. Many plaintiffs also cited similar reasons for engaging in off-the-clock work—that they could not afford to fall behind once the line started or did not want to get blamed for delays. *See*, *e.g.*, Depo. Jessica Byers, 100:14–101:7 (Jan. 27, 2011) (explaining that she needed to start before her shift to finish tasks left undone from the previous shift, or else she "would get blamed for the process not being done"); Depo. Camille Green, 74:5–74:18 (Jan. 19, 2011) ("Well, we had to do run charts and get our bolts if we needed it and get ready because when the line starts the line starts and you had to be ready.").  Thus, the scheduled time system creates a *potential* for uncompensated overtime, which inures to the benefit of HMA at the expense of its workers. This

scheduled time system arguably affects all opt-in plaintiffs, because the demands of working in a production facility puts pressure across the board to work outside the shift so that all work can be performed within the scheduled time.

On the other hand, HMA has created release valves for this pressure. One example is HMA's employment of associates before and after the shift ended, for which the associates were paid overtime. Some zones would also use line or logistics associates who would assist on the line by restocking parts, among other tasks. Moreover, depending on the associate's job responsibilities (e.g., what tools they used, or how many parts they needed to perform the process), associates would feel less pressure to work off the clock. Indeed, some plaintiffs even testified that, although in some zones they would work off the clock,  in other zones they did not have to do so, indicating that the pressure inherent in the scheduled time system did not apply equally to all plaintiffs in all zones. The defendants argue that unpaid overtime, to the extent it occurred,  resulted from a number of variables that change depending on the zone, process, supervisor, and individual plaintiff, and not solely from the scheduled time compensation system. *See* Def. Expert Rpt. of Brian Farrington (Ex. 2 to doc. 100).

The difficulty in reconciling the parties' perspectives on the common plan or policy results from HMA's compensation system as falling somewhere in between these characterizations. The scheduled time system, alone, does not create FLSA violations, and some plaintiffs even testified that in certain zones they did not work off the clock. On the other hand, the scheduled compensation system, and the consequent  pressure of being prepared for the start of the line running, significantly contributes to plaintiffs working off the clock before the shift starts or before it resumes after the lunch period.

16

For the plaintiffs to show they are similarly situated, however, they must show *liability* on a class-wide basis. *See Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372, 381 (W.D. Pa. 2011) (explaining that distinctions among the plaintiffs were not a basis to decertify, because the distinctions went to individual *damages*, and not "liability across the entire class"); *Lugo v. Farmer's Pride*, 737 F. Supp. 2d 291, 303 (W.D. Pa. 2010) (explaining, in a case decertifying a collective action, that "this case differs from those where liability can be proven on a class-wide basis"). Based on the deposition testimony, the plaintiffs will face a difficult time proving class-wide liability at trial, and proving liability will require a much more granular inquiry than that required in the meat processing donning and doffing cases cited by the plaintiffs. *Cf. In re Tyson*, 694 F. Supp. 2d 1372 (M.D. Ga. 2010); *Johnson v. Koch Foods*, 647 F. Supp. 2d 951 (E.D. Tenn. 2009); *Bouaphakeo v. Tyson Foods*, 564 F. Supp. 2d 870 (N.D. Iowa 2008). In contrast to those cases, no common plan or practice has emerged from the depositions to indicate to this court that class-wide liability exists.

Moreover, even were the court to assume class-wide liability, material differences exist as to the extent of damages. Although courts have recognized that material differences only as to damages is *generally* considered insufficient to deny class treatment, *see Lugo*, 737 F. Supp. 2d at 303, proving damages in a way that is not overly prejudicial to the defendants would require individual inquiries in this case.

*Disparate Factual and Employment Settings*

The defendants argue that significant distinctions exist among the plaintiffs including, among others, variations in job duties and requirements at different zones and even within the same zone, variations in how the plaintiffs' zones were managed, and variations in pay practices at different zones, including the use of overtime. The court agrees, and finds that these variations are material

enough to conclude that the associates are not similarly situated. *Cf.* Def. Expert Rpt. of Brian Farrington (Ex. 2 to doc. 100) (explaining that whether and to what extent associates would work off the clock varies with several factors, including  the nature of the plaintiff's work and organizational factors; personnel, staffing, and performance issues on the line; and the personal choices of associates in how they performed their work).

For example, one factor material to whether process associates worked off the clock was the use of parts, if any, in a zone. In depositions, many of the plaintiffs testified that they would have to come in before a shift to ensure that they had enough parts so that they would not fall behind once the line started. But the evidence indicates that some zones would have their own delivery associates bring parts to the process stations, while other zones would have PMC deliver parts to the stations, while yet other zones had processes that did not install parts or use bulk parts. If the zone did not need to use parts, or its parts were well stocked, associates would not have as much need to work off the clock.

Another variable in whether an associate would feel pressure to perform work before the shift was the use of tools, particularly the use of tools that required preparation. Some plaintiffs testified in deposition that they would arrive at their work area before a shift started to calibrate a tool required for their process, such as a torque wrench. Some processes, however, would not use tools, or would use tools that were attached to the process, and not all tools would require preparation. In zones that used tools that did require preparation, some zones would either have a preshift associate or TC who checked the tools before the start of the shift; some zones would have quality associates check the tools; and in other zones the associates would have time to check the tools after the TC's shift meeting.

The practice of a TC in a particular zone as to the manner of conducting shift meetings or posting process schedules also appeared to influence whether a plaintiff could engage in off-the-clock work. In some zones, the TC would not post process rotations until immediately before the shift started or after the shift meeting. As the defendants emphasize, associates could be precluded from performing work before a shift if they do not know to which task they are assigned until the moment the shift starts. Similarly, although most zones had their shift meeting after the shift started, the length of the meetings would vary. If meetings were shorter, associates could have more time to prepare their work station before the line actually began to run and would feel less pressure to work before the shift.

The pay practices and overtime budgets of each zone also differed and affected whether an associate would feel pressure to perform work before the start of his shift. Overtime budgets were determined for each zone, based on the recommendations of individual TMs who would analyze the tasks that had to be performed before the line started and after the line stopped. Relatedly, the preshift tasks performed would vary by zone, and could include checking reports, reviewing e-mails, setting out and calibrating tools, and other activities. The amount of overtime that TMs would authorize for preshift associates in a zone would also vary, but the evidence demonstrates that the TMs frequently employed preshift associates to prepare a zone before a line started so that the other associates in the zone could begin working at shift start and not have to work before. That the plaintiffs have cited many instances where they nevertheless felt the need to perform preshift work does not reflect a "single decision, plan, or policy" that equally affects all opt-in plaintiffs, but instead demonstrates that individualized inquiries will be necessary to determine whether a specific plaintiff in a specific zone has engaged in off-the-clock work. *See Lugo*, 737 F. Supp. 2d 291, 303

19

(E.D. Pa. 2010) ("The evidence indicates that there may be some hourly production workers who have legitimate claims of undercompensation for time spent donning and doffing, and some who may not; the evidence does not demonstrate, however, that the question of undercompensation can be answered in a manner common to all plaintiffs."); *TGF Precision Haircutters*, 2005 U.S. Dist. LEXIS 44259, at *20–21 ("The foregoing conglomerate of diverse evidence indicates that some Plaintiffs may have prima facie claims for FLSA violations at different times, in different places, in different ways, and to differing degrees, but the evidence of varied particular violations is insufficient to show that the Defendants implemented a uniform, systematically applied policy of wrongfully denying overtime pay to the Plaintiffs.").

Most significantly, some of the plaintiffs themselves would testify to regularly performing unpaid work in some zones but not performing unpaid work in other zones, or performing unpaid work in isolated incidences. For example, Plaintiff Kim Greer stated that she would have to perform preshift work in one zone, but could not recall performing work in another zone she had worked in. Plaintiff Freida Groce testified to performing two minutes of unpaid work per day in PMC, but working unpaid time on isolated occasions during eight years in AF1, zone 5. Plaintiff Sonya Garrett also testified that she worked unpaid time in some zones but not others, explaining that she did not work before her shift in AE1, Block 1, or AF2, Zone 3, but would perform unpaid work in AF1, zone 9. Other courts have considered whether the plaintiffs' *claims* are factually disparate as a factor in granting a motion to decertify. *See Proctor*, 250 F.R.D. at 282.

That these variations preclude finding the plaintiffs are similarly situated becomes clearer when viewed in light of the cases cited by the plaintiffs in arguing they were affected by a common plan or policy. *See* Pl. Opp. Br. at 14 (doc. 130) ("Defendants' system is essentially the same as the

'line time' or 'gang time' timekeeping method that has been held to satisfy the 'similarly situated' standard in a series of decisions in this and other circuits."). These cases fall into two categories: (1) donning and doffing cases where a defendant's time-keeping system structurally precluded time for donning and doffing, *see*, *e.g.*, *In re Tyson*, 694 F. Supp. 2d 1372 (M.D. Ga. 2010); and (2) cases where substantial evidence existed of an official or unofficial policy to preclude overtime because of supervisors either telling plaintiffs to not record hours or shaving their hours worked. *See*, *e.g.*, *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528 (S.D. Tex. 2008). Neither category applies to this case.

The first category of cases involve collective action suits over donning and doffing, often at meat processing plants. For example, in *In re Tyson*, 694 F. Supp. 2d 1372 (M.D. Ga. 2010), the plaintiffs were hourly employees at Tyson chicken processing plants who showed that they were *required* to don, doff, and sanitize safety and sanitary gear before and after working on the production line. Tyson's compensation system (termed the "mastercard method" in that case) only paid the plaintiffs for the time they were on the production line, operating under an official policy that donning and doffing activities were not compensable. *See Tyson*, 694 F. Supp. 2d at 1375. In defense, Tyson presented evidence that its supervisors had discretion to compensate employees for donning and doffing time, pointing out that some supervisors gave employees on certain lines "grace periods" to don and doff before the line started and that other supervisors were more lenient or would occasionally approve overtime pay. *See Tyson*, 694 F. Supp. 2d at 1376–77. The district court found Tyson's arguments unavailing, concluding that "Tyson's common practice of paying Plaintiffs by the mastercard method weighs heavily against decertification" because it precluded payment for "some or all of the time they spent donning, doffing, and sanitizing their safety and protective gear."

21

*See Tyson*, 694 F. Supp. 2d at 1379. That some supervisors provided grace periods was of little consequence, because the grace periods were relatively uniform on a plant and/or production line basis. *See Tyson*, 694 F. Supp. 2d at 1379.

*Tyson* is distinct from the instant case because HMA's associates, as a group, were not *required* to perform any preparatory work before the start of their shift. Although many HMA associates may have worked before their shifts started, the record in this case does not demonstrate that all associates had to do so. In fact, the defendants cited to examples in the record where certain associates claimed they did not have to work before their shift started while assigned to certain zones. Because associates could plausibly have started working when their shifts began, HMA's scheduled time system need not be given the same weight against decertification as the mastercard method in *Tyson*.

Other donning and doffing cases echo the district court's analysis in *Tyson*. For example, *Bouaphakeo v. Tyson Foods*, 564 F. Supp. 2d 870 (N.D. Iowa 2008) involved a Tyson pork processing plant with similar practices as the Tyson chicken plant. Although Tyson provided its hourly employees some compensation for work in donning and doffing personal protective equipment ("PPE"),[5] the employees alleged that Tyson's "gang time" system failed to compensate them for "all required pre-production line and post-production line activities" necessary for their positions, including donning, doffing, and sanitizing their equipment. *See Bouaphakeo*, 564 F. Supp. 2d at 896. The district court agreed with the employees and explained that, notwithstanding "some

---

[5] Although the HMA associates were required to wear some PPE, such as safety glasses, bump caps, and steel-toed shoes, the plaintiffs do not appear to argue that the time taken to don and doff this equipment constituted off-the-clock work. Instead, they focus on other pre-shift activities they argue were incident to and necessary for the work that occurred during the scheduled shift. Accordingly, this court has not considered PPE as a factor in this similarly situated analysis.

very big factual differences among [the] hourly employees," the gang time system was the "tie that binds" the employees together. *See Bouaphakeo*, 564 F. Supp. 2d 870.  Because almost all the Tyson employees used some kind of knife that had to be sharpened and sanitized, and wore multiple kinds of PPE that had to be donned and doffed, the court concluded that the employment and factual settings supported certification. *See* 564 F. Supp. 2d at 870. As with the Georgia *Tyson* case, the *requirement* that the plaintiffs don and doff their PPE before and after working on the line was implicit in the court's conclusion that a "single decision, policy or plan" existed because of the "gang time" system.

The plaintiffs cite to a number of other cases for similar propositions. *See Koch Foods*, 657 F. Supp. 2d at 955 ("Plaintiffs have submitted evidence that they are paid by production line time and that this payment does not capture donning and doffing, waiting, sanitizing, and walking. They have shown that they must be washed and dressed when they take their places on the production line, but they are not paid until the line starts to run."); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 556 F. Supp. 2d 941 (W.D. Wis. 2008) ("Regardless whether plaintiffs work in different areas, on different shifts, and don and doff different amounts of protective gear, they were subject to defendant's general practice of not compensating employees for donning and doffing certain protective gear and walking to work areas, in violation of the FLSA."); *Frank v. Gold'n Plump Poultry*, 2007 U.S. Dist. LEXIS 71179, at *9 ("The bottom line is that Gold'n Plump has, at a minimum, decided not to require that its employees be paid for donning and doffing. That no-policy policy has allegedly injured all members of the putative class and is properly challenged through a class action."); *see also Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372 (W.D. Pa. 2011) (finding all plaintiffs at a coke manufacturing plant similarly situated because they were all subject to "the

longstanding practice of non-compensation for time spent walking between their work sites and the locker rooms before and after their eight-hour shifts."). The court emphasizes that these cases all involved a "single decision, policy or plan" that would *inherently* result in unpaid overtime for the plaintiff class. Although HMA's scheduled time system likely resulted in unpaid overtime for some plaintiffs, unpaid overtime for all plaintiffs is not inherent in its system.

This case is less akin to these donning and doffing cases than it is to other cases cited by the defendants. For example, in *Lugo v. Farmer's Pride*, 737 F. Supp. 2d 291 (W.D. Pa. 2010), a donning and doffing case in which the court decertified the plaintiff class, the plaintiffs worked at a chicken processing plant and were paid on a line time system that built in preset extra time for donning and doffing. That court determined that the plaintiffs alleged essentially two theories of liability; among them that the compensation system, if implemented as the defendant claimed, undercompensated for donning and doffing. *See Lugo*, 737 F. Supp. 2d at 303. That court granted the defendant's motion to decertify, explaining that although the evidence indicated some hourly workers may have claims for undercompensation, it also indicated that others may not. *See Lugo*, 737 F. Supp. 2d at 303. The court explained that "the liability of defendant depends on whether defendant failed to pay a particular plaintiff for compensable time spent performing donning-and-doffing activities." *Lugo*, 737 F. Supp. 2d at 303. Thus, the court concluded that "undercompensation was not suffered on a collective basis–i.e. according to a 'single decision, policy or plan' applicable to all plaintiffs–but rather that defendant's policies and practices impacted individual plaintiffs in individual ways." *Lugo*, 737 F. Supp. 2d at 303. Acknowledging that "plaintiffs bear some general similarities to one another," the court still found material distinctions, explaining that "plaintiffs worked in different positions and departments and on different shifts at defendant's plant" and that

24

the plaintiffs' claims would vary depending on these different positions and departments. *Lugo*, 737 F. Supp. 2d at 304.

The plaintiffs attempt to distinguish *Lugo*, stating that "unlike the instant case, the company in *Lugo* did not have a common policy of non-compensation for pre-shift activities" because the system in *Lugo* "affirmatively provided predetermined allowance for 'off-the-clock' activities . . . ." Pl. Opp. Br. at 59–60 (doc. 130). The plaintiffs accurately interpret *Lugo*, but the factual distinction they argue is of little import. First, as the court has explained, it has not concluded that HMA has a common policy of non-compensation for pre-shift activities. In fact, HMA regularly employs pre-shift associates to perform pre-shift activities for which these associates receive overtime pay. That regular associates may feel a need to work before the shift anyway is an issue that will vary depending on the associate's position and zone, as it did for the plaintiffs in *Lugo*. In this case specifically, the pressure associates feel to work off the clock will also depend on the efficacy of the pre-shift associate in the particular zone. Second, the plaintiffs' distinction ignores the evidence that not all associates across the HMA facility are required to work before the shift to be ready for the start of the shift, as in the meat processing plant cases cited by the plaintiffs. Although some associates testified that they felt the need to perform this work, the testimony of others casts doubt on whether all plaintiffs had to do this work incident to their job.

Similarly, the court is not persuaded by the plaintiffs' attempt to equate this case to *Tyson* and similar cases by arguing  that the "scheduled-time compensation system is structured to force employees to perform off-the-clock work in order to be ready to keep up with the demands of the production line once scheduled-time pay begins and the production line begins to operate." Pl. Opp. Br. at 43 (doc. 130). That the defendants "structured" their compensation "to force" employees to

perform off-the-clock work is an overstatement not supported by the evidence. As the court explained above, whether the employees work off the clock is not inherent in the compensation system, but instead is a combination of the scheduled time system and a number of other factors that vary depending on the zone in which the employee works.

The plaintiffs appear to recognize they may have overstated their argument, stating in their next sentence that "[e]ven if that were not the case, the Department of Labor's regulation states that '[w]ork not requested but suffered or permitted is work time . . . .'" Pl. Opp. Br. at 44 (doc. 130) (alterations in original) (quoting 29 C.F.R. § 785.11). The plaintiffs also cite 29 C.F.R. § 785.13,[6] which states that management has a duty "to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has a power to enforce the rule and must make every effort to do so." But whether management had knowledge is a defense that goes to the merits, and an issue that goes to the

---

[6]  In citing 29 C.F.R. § 785.13, the plaintiffs also cite *Reich v. Dept. of Conserv. & Nat. Resources*, 28 F.3d 1076 (11th Cir. 1994) as a case interpreting this regulation. In *Reich*, the Eleventh Circuit reviewed a district court's determination that the Alabama Department of Conservation and Natural Resources did not have actual or constructive knowledge of FLSA violations among its officers. *See Reich*, 28 F.3d at 1078.

Although the court will refrain from an extensive discussion on the merits, it notes that the Eleventh Circuit's analysis in *Reich* actually weakens the plaintiffs' argument that even if off-the-clock work were not structured into HMA's compensation scheme, HMA should nevertheless have known about it and prohibited unpaid overtime. In *Reich*, the Court found that the Department had actual knowledge of overtime violations from an Alabama state study that "unreported overtime during deer hunting season continued to be a substantial problem despite the Department's 1985 written policy prohibiting all such work." *See Reich*, 28 F.3d at 1083. The Court also found constructive knowledge by imputing to the Department inconsistencies "contained in the weekly and arrest reports." *See Reich*, 28 F.3d at 1083. Analogizing to a prior Fifth Circuit case, the Court explained that "[a]s in this instance, the employees in *Brennan* were required by the nature of their jobs to work long and irregular hours in the field." *See Reich*, 28 F.3d at 1084 (citing *Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825 (5th Cir. 1973)).

In this case, any evidence that management has knowledge of the alleged FLSA violations falls far short of the facts in *Reich*. Moreover, the nature of the FLSA violations in this case—ranging from ten to fifteen minutes of off-the-clock pre-shift work per day to no off-the-clock work for some plaintiffs—are quite attenuated relative to the "long and irregular hours" referenced in *Reich*.

individual defenses the defendants may raise.

The second category of cases the plaintiffs cite in arguing that a common plan or policy affects them involve cases where a defendant had an overarching national policy of denying overtime pay. One example from a district court in the Eleventh Circuit is *Hill v. Muscogee Cty. Sch. Dist.*, 2005 U.S. Dist. LEXIS 35725 (M.D. Ga. Dec. 20, 2005), where thirteen paraprofessionals/teacher's aides at ten different schools alleged that they were assigned work that could not be completed within their scheduled hours, and that they were not paid for the additional hours worked. *See Hill*, 2005 U.S. Dist. LEXIS 35725 at *3–5. The court explained that "if the decision makers all employ the same practice to deny overtime compensation, one justifiable inference which arises is that the pattern of violations was not coincidental but resulted from the application of a central policy." *See Hill*, 2005 U.S. Dist. LEXIS 35725 at *11. Under that rationale, the plaintiffs were similarly situated because they "presented substantial allegations that they were subjected to the same practice," which raised the inference that "overtime decisions at different schools were not merely coincidental products of autonomous decision-making by the individual principals." *Hill*, 2005 U.S. Dist. LEXIS 35725, at *13. Instead, the court found that the thirteen plaintiffs had substantially alleged that they were subject to a common, albeit unofficial, policy of denying overtime pay. *See Hill*, 2005 U.S. Dist. LEXIS 35725, at *13.

The district court in *Hill* is not alone in inferring an unlawful common practice from the similar testimony of plaintiffs in disparate locations. In *Wilks v. The Pep Boys*, 2006 U.S. Dist. LEXIS 69537 (M.D. Tenn. Sept. 26, 2006), the court also inferred a "common, impermissible" practice from the testimony of several plaintiff employees at the Pep Boys stores; the employees stated that their managers would deliberately attempt to reduce overtime liability by instructing their

27

subordinates to shave hours from the payroll records of hourly employees or by requesting their employees to work off the clock. *See Wilks*, 2006 U.S. Dist. LEXIS 69537, at *15–18. Similarly, the district court in *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 536 (S.D. Tex. 2008), found that the plaintiffs had "provided significant evidence in support of their claims that all of the opt-ins either worked off the clock or had time shaved off their hours" and had, thus, proven that Starbucks "created an environment that at least strongly motivated managers to commit the alleged FLSA violations." *See Falcon*, 580 F. Supp. 2d at 536; *see also Kautsch v. Premier Communications*, 2008 U.S. Dist. LEXIS 7219, at *7–8 (W.D. Mo. Jan. 31, 2008) (finding that the defendant "maintained a top-down, centralized policy" to deny overtime based on evidence that the CEO had directed managers to make sure their employees kept their time sheets at 40 hours a week and below and based on other testimony that some managers instructed their employees not to report overtime).

These cases, however, do not persuade the court that the HMA associates are similarly situated. First, in *Falcon* and *Kautsch*, the plaintiffs had very similar job duties. *See Falcon*, 580 F. Supp. 2d at 536 (finding no dispute that "all of the opt-ins held the same job title and worked under the exact same job description and supervision hierarchy"); *Kautsch*, 2008 U.S. Dist. LEXIS at *2 (explaining that plaintiffs were all technicians that installed DirecTV systems, performed upgrades, and made service calls in customers' homes and in commercial buildings). Second, the courts in these cases inferred some overarching policy from deliberate conduct of the defendants or their agents, such as explicitly requesting employees to work off the clock or shaving hours off their time records.

For both reasons, these cases do not apply to the HMA associates. Although the plaintiffs in this case all held the same job title—"process associate"—their job duties varied in material ways,

which in turn affected the likelihood that they would feel pressure to work off the clock. The plaintiffs also have not presented evidence of an overarching policy that this court may infer from the conduct of the supervisors at HMA.  In fact, many plaintiffs testified that their managers did not direct them to work off the clock and, in some cases, testified that their managers were not even aware that they worked off the clock.

Moreover, HMA had an official policy of prohibiting work off the clock. They published this policy within the Employee Handbook, which was distributed to all associates. This policy was also presented to all new HMA associates at orientation (although Elwood employees did not undergo this orientation), and communicated to TMs and TCs. Although the plaintiffs allege that HMA did not focus on the policy until after this lawsuit had been filed, the defendants provide evidence that, at the very least, TMs and TCs were aware of this policy before the lawsuit had been initiated. *See*, *e.g.*, Decl. Adam Medlock, ¶¶ 2, 17 (Ex. 14 to doc. 100) (explaining that he has been a TM for about four years, and that throughout his employment "TMs and TCs have been instructed to ensure that associates do not work before or after shift or during lunch break without an overtime code"); Decl. Melvin Baker, ¶¶ 2, 8 (Ex. 6 to doc. 100) (explaining that he has been a TM for about nine to ten years and that throughout his employment TMs and TCs were instructed not to let associates work before or after the shift or during their lunch break).

The plaintiffs correctly state that  the existence of an official policy to prohibit off-the-clock work means little if it exists alongside an unofficial policy to deny overtime. *See Falcon*, 580 F. Supp. 2d at 536 (finding that the plaintiffs had proven they were similarly situated "despite the fact that Starbucks had an official 'time worked is time paid' policy"); *Hill*, 2005 U.S. Dist. LEXIS 35725, at *10 (explaining that the defendants' evidence that at least some plaintiffs were told not to

work overtime could be construed as form over substance). In this case, the plaintiffs argue that HMA merely states a "pro forma policy of paying for all hours worked" when in reality HMA only has a policy of allowing, but not requiring, employees to be paid for overtime. The plaintiffs, however, have not provided evidence that the TMs and TCs were "simultaneously trained, advised, or encouraged **not** to follow the written policy," *see Boar's Head Provisions Co.*, 671 F. Supp. 2d 957, 962 (W.D. Mich. 2009) (emphasis in original), in contrast to cases like *Falcon* and *Hill* where the plaintiffs offered evidence that supervisors deliberately intended to subvert the written policy.

In fact, by regularly paying overtime and allocating overtime budgets to its TMs and TCs, HMA evidenced its intent to comply with its own written policy. HMA's allocation of overtime budgets, of course, does not indicate intent to comply with the written policy alone, and in some ways may give the TMs motivation to require off-the-clock work. As the district court explained in *Wilks*, some managers at the Pep Boys would request their hourly employees to work off the clock or would shave time from their pay records "upon finding themselves short on allotted labor hours but with work still to be done." *See Wilks*, 2006 U.S. Dist. LEXIS 69537, at * 16–17. But, unlike *Wilks*, the plaintiffs have not shown that their managers engaged in similarly impermissible practices; at best, *some* plaintiffs testified that a TC or TM would ask them to make sure tools were checked before the start of a shift.

Finally, the court disagrees with the plaintiffs that the "scheduled time" compensation system outweighs individualized differences between class members. The plaintiffs' assertion may be true in cases where the compensation system necessarily requires the plaintiffs to work off the clock, or where the plaintiffs have very similar job duties and are subjected to a deliberate plan to deny overtime payment. But it does not apply here because not only would damages be highly variable,

the court doubts the plaintiffs can even establish class wide liability. As explained in another donning and doffing case relied upon by the plaintiffs,

> the task of a court reviewing a motion for class certification is to decide whether any differences identified are of the type that would make piecemeal litigation a superior vehicle for resolving each of the claims, or, to be more specific, whether the differences will make it impractical to resolve any significant issues regarding liability on a class wide basis.

*Spoerle v. Kraft Foods Global*, 253 F.R.D. 434, 439–40 (W.D. Wis. 2008). This court has concluded that the differences among the plaintiffs will make it impractical to "resolve any significant issues regarding liability on a class wide basis." This impracticality becomes even more apparent when considering the individual defenses that the defendants can assert in this case.

*Defenses Available*

The defendants assert that they will rely on both factual and legal defenses in this case, and that both types of defenses will require individualized evidence. The defendants claim that they will need to present individualized evidence on at least eleven different factual defenses. As examples, the defendants state they will need to provide individualized evidence on whether a plaintiff could have possibly worked off the clock as alleged based on his or her scan in times, whether other associates in the plaintiff's zone who performed the same processes as he did would punch in seconds or minutes before a shift began, or whether the plaintiff could name any member of management who saw him perform the alleged work before a shift or during a lunch break.

The defendants' argument has merit. Out of the fifty depositions, which were supposed to be representative testimony of the over six hundred opt-in plaintiffs in this case, the defendants have already pointed out at least two plaintiffs whose scan in times contradict their deposition testimony. *See* Def. Br. at 59. One of these deponents, Melinda Mayfield, testified that every morning she would

scan in at a station 2-3 minutes away from her zone, would take 7 minutes to complete her forklift inspection sheet, and would take 5-6 minutes to put gas in her forklift. Her scan in records, however, reflected that she typically scanned in 3-6 minutes before her shift, and many times would scan in 2-3 minutes before her shift, giving her time only to walk to her zone area. Similarly, another deponent, Kenneth Curry, testified that he would scan in at a terminal that was a 3-4 minute walk to his zone, and that he worked for 15-20 minutes before his shift on several occasions. The records, however, reflect that he rarely scanned in 15-20 minutes before his shift, and would often punch in at around 5 minutes before his shift. As to Mr. Curry, the defendants also cite to a declaration by another HMA employee who worked in the same zone and testified that he typically did not perform pre-shift work in that zone.

The plaintiffs do not appear to respond to the defendants' arguments concerning defenses to liability directly, but instead rely on cases explaining that defenses relevant to *damages* should not preclude a collective action. *See* Pl. Opp. Br. at 23–25 (doc. 130) ("III. DEFENDANTS' INDIVIDUALIZED ISSUES RELATE TO DAMAGES, NOT LIABILITY") (citing *Hill*, 2005 U.S. Dist. LEXIS 35725, at *15; *Andrako*, 2011 U.S. Dist. LEXIS 23583, at *26–27; *Spoerle*, 253 F.R.D. at 440; *In re Tyson*, 694 F. Supp. 2d at 1379–80). The majority of the cases they rely upon were also cited in arguing that HMA has a common policy or plan. The court again does not find these cases persuasive on the issue of raising individualized defenses to liability, a result that should not be surprising given the overlap among the factors. *See Big Lots Stores*, 561 F. Supp. 2d at 574 ("These three factors are not mutually exclusive, and there is considerable overlap among them.").

For example, in *In re Tyson* the court rejected Tyson's argument that the plaintiffs' "proposed method of proving their damages will also cause individualized issues to swamp common ones,"

explaining that Tyson misunderstood the plaintiff's approach of presenting sample representative testimony as to the amount of time it would take "to don, doff, and sanitize sanitary and protective gear and walk to the line." *In re Tyson Foods*, 694 F. Supp. 2d at 1379–80. The plaintiffs in this case state that they will also prove damages "using representative testimony and Defendants' own documents and payroll." *See* Pl. Opp. Br. at 25 (doc. 130). They do not, however, propose any method of giving representative testimony that will fairly encompass all the various job duties and processes the associates perform at the HMA facility. Even had the plaintiffs proposed a method, the court finds the use of representative testimony dubious given the inconsistencies the defendants have already highlighted in this small sample of plaintiff depositions.

The plaintiffs also argue that credibility is a matter for the jury, and should not be considered on a motion to decertify. *See* Pl. Opp. Br. at 31 (doc. 130) (citing *Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1362 (S.D. Fla. 2007)) (other citations omitted). The defendants respond by arguing that contradictory evidence is appropriate for consideration at the decertification stage. *See* Def. Reply Br., at *12 n. 27 (citing *Lugo*, 737 F. Supp. 2d at 308). The court agrees with the defendants, to the extent that the court considers the contradictory evidence in deciding whether to decertify, and not in considering the merits of the plaintiffs' claims. Whether Mr. Curry's testimony is irreconcilable with or should be believed over his scan in times is, indeed, an issue for the jury. That the defendants would have to question and impeach individual plaintiffs, because no representative testimony exists as to the extent of a plaintiff's unpaid overtime, is a point the court must consider in deciding whether the plaintiffs are similarly situated and whether a collective action is proper in this case. *See Smith v. T-Mobile USA*, 2007 U.S. Dist. LEXIS 60728, at *21–23 (explaining that at the decertification stage, the court would not view declarations offered by the

defendant as disproving a plaintiff's allegations, but that it would consider the individualized nature of the defenses in considering whether the case should be decertified).

Similarly, the defendants argue that their legal defenses will also be individualized. The plaintiffs argue against this notion, explaining that defenses such as what constitutes "work" or what work would be *de minimis* could be tried collectively. The plaintiffs argument has some merit, at least as to the first defense, because what constitutes "work" for the FLSA is a question of law, *see Birdwell v. City of Gadsden*, 970 F.2d 802, 807 (11th Cir. 1992) ("Whether a certain set of facts and circumstances constitute work for purposes of the FLSA is a question of law."), and many of the plaintiffs allege similar pre-shift work activities (for example, having to stock parts before the shift or calibrate torque wrenches). Thus, the court could conceivably review a list of tasks the plaintiffs alleged they performed off the clock, determine whether those tasks constitute work, and apply its findings to the class as a whole. But this argument ignores the other, numerous, difficulties in trying the case collectively. First, given the variety of processes performed across the plant, the court doubts whether the pre-shift tasks the plaintiffs list on page 36 of their opposition brief will encompass all the plaintiffs' allegations in this case. Second, whether a plaintiff has performed those tasks will require individualized inquiries, unlike the donning and doffing cases the plaintiffs rely upon where *all* plaintiffs had to don and doff PPE before starting on the line. Complicating this second issue is that many plaintiffs rotated processes and zones during their time at the plant, which would necessitate an inquiry into who performed what processes, in what zone, and for how long.

The plaintiffs argument that *de minimis* defenses can be tried common to all plaintiffs is also flawed. The plaintiffs rely on *Spoerle*, a donning and doffing case, which concluded that the defendant did not "develop any meaningful argument that there [were] significant differences among

class members" as to how the defenses could be resolved, explaining as an example that "defendants [did] not suggest that some potential class members have de minimis claims and some do not . . ." *See Spoerle*, 253 F.R.D. at 440. In this case, however, the defendants plausibly assert that some potential class members have *de minimis* claims and others do not. The *de minimis* rule, as defined by the Supreme Court, is that "[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded." *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946). When applying the *de minimis* rule, three considerations are appropriate: "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Burton v. Hillsborough Cty.*, 181 Fed. Appx. 829,  (11th Cir. 2006) (quoting *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984)).

The plaintiffs argue that "[t]he term 'aggregate' obviously requires a 'common answer' for a class as a whole," and that, similarly, the "regularity of the additional work" is common to the class "because the work at issue occurs at fixed times at the beginning and ending of each day and during the unpaid break." Pl. Opp. Br. at 29 (doc. 130). The court disagrees. As the Ninth Circuit explained in *Lindow*, "aggregate amount of compensable time" refers to the total amount of unpaid time an individual plaintiff accrues; thus, to compensate "one worker $50 for one week's work while denying the same relief to another worker who has earned $1 a week for 50 weeks" would "promote capricious and unfair results." *Lindow*, 738 F.2d at 1063. Similarly, regularity of additional work refers to the frequency with which a plaintiff worked off the clock. *See Lindow*, 738 F.2d at 1063 ("[W]e will consider whether the plaintiffs performed the work on a regular basis."). Both these factors require an individual inquiry as to each plaintiff—whether the plaintiff had acquired a

substantial aggregate claim, and whether the off-the-clock work was done on a daily basis or only sporadically. As the defendants have pointed out from the depositions, in this case both factors, and especially the regularity of additional work, vary across the class.

Even *if* other defenses could be litigated collectively, such as whether management knew that off-the-clock work occurred across the facility, the plaintiffs are not similarly situated as to the several other important defenses just discussed. This court cannot discern how the plaintiffs will proceed in this case in a way does not unduly prejudice the defendants without the case devolving into mini-trials for each plaintiff. Accordingly, the various defenses the defendants state they will raise at trial also persuade the court to decertify this case. *See T-Mobile*, 2007 U.S. Dist. LEXIS 60729, at *23–24 ("[D]efenses, such as . . . what constitutes 'work,' or the *de minimis* exception to the FLSA, must, by their nature, by individualized. Thus, Plaintiffs are not similarly situated with respect to how these defenses would be litigated against them.").

*Fairness and procedural considerations*

In arriving at the conclusion to decertify this collective action, the court is cautioned by the facts and procedural history of the *Big Lots* case, where the district court denied the defendant's first motion for decertification, only to later grant it after it had authorized extensive discovery and uncovered more and more material distinctions. *See Big Lots*, 561 F. Supp. 2d at 587. In her order and opinion, Judge Sarah Vance in the Eastern District of Louisiana regretted having to decertify the case "after the large investment of resources by the parties." *Big Lots*, 561 F. Supp. 2d at 587. Judge Vance nevertheless justified waiting to decertify, noting the evidence was more limited earlier in the case and that the plaintiffs' earlier showing had entitled them to proceed with the case collectively. *See Big Lots*, 561 F. Supp. 2d at 587.

Here, however, the plaintiffs have not made enough of a showing to proceed with this action collectively. Although the court recognizes the broad remedial purpose of the FLSA, and is open to litigation strategies that efficiently help plaintiffs recover unpaid overtime, the plaintiffs have not presented any cohesive or fair approach to this collective action that would address the concerns raised by the defendants and not result in addressing the factual allegations of several hundred plaintiffs individually. The lack of a substantive approach is evident from Section X of the plaintiffs' brief, titled "The Case Can Be Fairly Tried on a Collective Basis;" in one conclusory sentence they state that "[c]ourts have also rejected decertification when, as here, a collective trial will provide the defendant with a fair opportunity to present any individualized evidence that may be relevant to a scheduled-time compensation system." *See* Pl. Opp. Br. at 48 (doc. 130). To the court, this sounds an awful lot like trying each plaintiffs' case individually. The plaintiffs provided no further explanation on *how* the case would be tried otherwise, instead hiding the lack of a substantive litigation strategy behind a smoke-screen of citations that do not support their proposition.

The only strategy that the plaintiffs propose in collectively litigating this case is to base their *prima facie* case on "the plant-wide testimony of defendants' own officials, its timekeeping and payroll records, expert testimony and the common scheduled-time compensation system that defendants have adopted for the plant as a whole." Pl. Opp. Br. at 53 (doc. 130). Partially contradicting their earlier statement that they would rely on representative testimony in presenting their case, *see* Pl. Opp. Br. at 25 ("Plaintiffs in this matter will prove damages . . . using representative testimony and Defendants' own documents and payroll"), they later state that their case will not be "dependent solely upon 'representative testimony' from anecdotal class members."

*See* Pl. Opp. Br. at 53 (doc. 130). Instead of relying on representative testimony,[7]  the plaintiffs

intend to rely on their expert's "gap time" analysis that calculated the difference between when the

opt-in plaintiffs clocked in and the time their shift started. They state that "[w]hether Honda's

punchclock records afford a 'reasonable inference' of the amount of unpaid time under the foregoing

standards is a *common question* of fact that will have to be decided on the basis of evidence about

such records." Pl. Opp. Br. at 56 (doc. 130).

　　　　In considering the fairness and procedural considerations of trying the case collectively, the

court cannot conclude that punchclock records afford a reasonable inference of a plaintiff's unpaid

overtime. The defendants' expert points out several flaws in the plaintiffs' expert's analysis, but

most especially flawed is the assumption that *all* plaintiffs start work from the moment they scan in.

This assumption is refuted by the plaintiffs' own testimony, as many stated that they would arrive

at work early and go to the cafeteria, smoke a cigarette before the shift started, or talk with other

associates. Although the nature of a collective action will always result in some inaccuracy in how

damages are calculated, allowing the plaintiffs to proceed on this gap time analysis would be unduly

prejudicial to the defendants. *See Gatewood v. Koch Foods of Mississippi, LLC*, 2009 U.S. Dist.

LEXIS 113896, at *70 (citing to *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 370 (D.N.J. 1987) for the

---

[7]  If representative testimony were to be a more important part of the plaintiffs' case, the court has concerns over the fairness of proceeding based on the limited deposition testimony taken thus far, even apart from the previously mentioned credibility concerns. Earlier in this case, the court denied a motion to dismiss plaintiffs who failed to attend depositions, *see* doc. 159, because it found dismissal to be too draconian a sanction. Upon reviewing the depositions, however, the court speculates as to whether a potential bias exists in that testimony among plaintiffs who had claims they were willing to state, noting that those who feel more strongly they worked uncompensated time would have a stronger motivation to attend. By itself, the court's speculation that such a bias exists would not be enough to decertify the class. But in conjunction with the slew of other difficulties posed by litigating this case collectively, the possible prejudice to the defendant is another factor that weighs in favor of decertifying. *Cf. Big Lots*, 561 F. Supp. 2d at 586 ("Because Big Lots could not call the managers and co-workers of the hundreds of plaintiffs to refute the individual plaintiffs' deposition or survey answers, opt-in plaintiffs could characterize their experiences without a realistic fear of direct rebuttal.").

proposition that "the plaintiffs' proposal would constitute an unconstitutional deprivation of property because the collective action mechanism would effectively prevent Xerox from defending the claims in a meaningful way"); *Big Lots*, 561 F. Supp. 2d at 588 ("Were the Court to rule in plaintiffs' favor, it would have to do so on the basis of proof that is not representative of the whole class, and the verdict would result in liability on the defendant in a magnitude that is not likely to be warranted in reality.").

Notwithstanding these concerns, the plaintiffs argue that fairness and procedural considerations support denying decertification because, on balance, the prejudice and harm to the plaintiff class outweighs the prejudice and harm to the defendants. The court acknowledges that Congress intended the FLSA to be "broadly remedial and humanitarian," *Wilks*, 2006 U.S. Dist. LEXIS 69537, at \*25–26, and that collective actions benefit the plaintiffs by allowing them to pool resources and pursue claims that they could hardly be expected to pursue individually. *See Bradford v. Bed Bath & Beyond*, 184 F. Supp. 2d 1342, 1351 (N.D. Ga. 2002). Fairness and procedural considerations do not focus only on the benefits to the plaintiffs, however. Instead, the court must balance the benefits of lowered cost and supposedly increased judicial efficiency against the potential detriment to the defendants and potential for judicial inefficiency. *See Wilks*, 2006 U.S. Dist. LEXIS 69537, at \*25–26. As the court has explained, the collective action would either proceed under a faulty and prejudicial method for finding liability and calculating damages while the defendants are hogtied in presenting their defenses, or would result in individual trials, rendering the collective action unmanageable.

The court also concludes that these fairness and procedural concerns cannot be alleviated by creating subclasses. Given the extent to which processes could vary within a zone, the court cannot

discern a way to fairly divide the subclasses. The plaintiffs only propose to create sub-classes by departments, although they do not present any arguments as to how these subclassifications could address the defendants' valid concerns. *Cf. Kuznyetsov v. West Penn Allegheny Health System*, 2011 U.S. Dist. LEXIS 146056 (W.D. Pa. Dec. 20, 2011) ("Plaintiffs' counsel provided no workable classification solution and failed to provide representative testimony. I have great reservations that this case could be tried fairly on a broad scale approach based on representative evidence.").

The court recognizes that it is opening itself up to several hundred individual cases by decertifying this case. And in light of the remedial purpose of the FLSA, the court, in fact, encourages these lawsuits if the individual plaintiffs have viable FLSA claims. That said, it disagrees with the plaintiffs that "[i]t would be a waste of judicial resources to decertify this case since the end result would be exactly what Defendant agrees at the outset of its brief to be inappropriate–i.e., over 600 trials, rather than one streamlined action." By decertifying the class, the court is saving the parties' time and expense of trying to litigate a case collectively that should have been litigated individually at the outset.

## VI.   CONCLUSION

For the reasons stated above, the court will GRANT the defendants' motion to decertify. The court, however, will DENY the defendants' motion to dismiss all opt-in plaintiffs. Instead, the court directs the Clerk to sever the causes of action of all plaintiffs except for the named plaintiff, Thsia Briggins, who will remain in this case. The Clerk is to electronically copy the complaint and answer filed in case number 1:08-CV-1861-KOB to the docket of the severed cases. Plaintiffs are to pay the filing fees for each of the severed cases on or before **Thursday, May 31, 2012**. If any severed plaintiff fails to pay the filing fee for his or her severed case as provided above, the court will dismiss

his or her case *with prejudice* on **Friday, June 1, 2012**.

The clerk of court is directed to assign all of the severed cases to the undersigned judge, but to withhold drawing a case assignment card for the undersigned judge for such cases until the court can meet as a whole and decide the appropriate allocation of case assignment credit. All of the above severed cases shall be consolidated for discovery purposes under case number 1:08-CV-1861-KOB, and all motions and pleadings are to be filed under that case. The court will simultaneously enter an order to this effect.

DONE and ORDERED this 29th day of March, 2012.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE